IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| **LAFAITH PHILLIPS**, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **CITY OF VALDOSTA** | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Ms. LaFaith Phillips, (hereinafter "Ms. Phillips" or "Plaintiff")

files this complaint against Defendant seeking redress of unlawful employment

discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964

and 42 U.S.C. § 1981.

## INTRODUCTION

Ms. Phillips, an African American female, was subject to a racially hostile

work environment when her supervisors made offensive racial jokes using racially

derogatory monkey memes, sliced the arm of her chair, chewed up and spit out her

pizza lunch, purposefully withheld employment information to interfere with

performance of her job duties, sabotaged her work by breaking vials, and a series

of other race-based microaggressions. The discriminatory working environment caused Ms. Phillips frequent headaches, discomfort, and post-traumatic stress. After reporting the illegal discriminatory behavior, the City retaliated against Ms. Phillips by applying policies more critically to her. Moreover, the City constructively terminated Ms. Phillips by subjecting her to a pervasive hostile working environment over multiple years, with increasing severity—including forcing her to falsify drug chemistry reports. Ms. Phillips was left to choose between her professional reputation and credentials or continued employment with the City.

The City of Valdosta, by and through its employees and supervisors Lieutenant Thompson, Director Hall, Chief Manahan, Chief Childress, various supervisors, and human resources department, have violated Ms. Phillips' right to be free from a racially hostile working environment. Defendants have employed tactics—for example, sharing derogatory monkey memes via City communication channels, issuing retaliatory employment performance evaluations, eliminating access to employee benefits, sabotaging drug chemistry reports, applying city policies in a discriminatory fashion, and others in contravention of Title VII. Ms. Phillips seeks compensatory damages, punitive damages, and equitable relief to make her whole.

## **PARTIES**

1.

Ms. LaFaith Phillips is an adult African American female formerly employed as a Criminalist – Drug Chemist at the City of Valdosta.  At all times relevant to this action, Ms. Phillips has been and continues to be a resident of the Middle District of Georgia. Ms. Phillips submits to the jurisdiction of this Court.

2.

The City of Valdosta, is now, and at all times relevant to this action has been a Georgia municipality.  Accordingly, at all times pertinent to this action, the City of Valdosta was an 'employer" within the meaning of Title VII.

## JURISDICTION AND VENUE

3.

This action arises under laws of the United States, including Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e, et. Seq and 42 U.S.C. § 1981. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4).

4.

This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988 and 29 U.S.C. §794(a).

5.

Venue is proper in the Middle District of Georgia pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Defendants have their official residence in the Middle District of Georgia, and a substantial part of the events and omissions giving rise to the claims in this action occurred in this district.

<strong><u>ADMINISTRATIVE EXHAUSTION</u></strong>

6.

Ms. Phillips filed a charge with the Equal Employment Opportunity Commission on August 29, 2019. Ms. Phillips filed an amended EEOC Charge on November 21, 2019. Ms. Phillips filed a second EEOC charge on or about June 13, 2020 for retaliation and constructive termination. Ms. Phillips received a Right to Sue Letter from the Commission for both charges on February 25, 2021. Ms. Phillips has exhausted her administrative remedies and files this action within the required 90 days.

<strong><u>FACTS</u></strong>

7.

On or about November 1, 2016, Ms. Phillips began working for the City of Valdosta as a Criminalist – Drug Chemist within the Valdosta Police Department, Valdosta-Lowndes Regional Crime Laboratory (hereinafter "Crime Lab").

8.

As a Criminalist – Drug Chemist, Ms. Phillips was responsible for completing analyses for various drug compounds for criminal investigations and testifying in court proceedings as an expert witness.

9.

As a Drug Chemist, Ms. Phillips followed protocols and procedures for evidentiary chain of custody and wrote reports detailing drug classification and scheduling for criminal charging. Ms. Phillips also testified as an expert witness and performed blood alcohol analysis for DUI and DWI cases.

10.

Based upon the reports completed by Ms. Phillips, criminal charges were adjusted to reflect misdemeanor, felony, or aggravated charges for prosecutorial authorities.

11.

Ms. Phillips reported to various managers and supervisors throughout her employment at the Crime Lab.

12.

Mr. Stephen Thompson, a white male, is the Lieutenant Crime Scene Supervisor and served as Ms. Phillips immediate supervisor. As her immediate supervisor, Lieutenant Thompson supervised Ms. Phillips' completed work, directed her daily work activities, evaluated her performance, and ensured compliance with City policy. Lieutenant Thompson also served as an Assistant to Becky Parker-Hall.

13.

Julie Grantham, a white female, is the Supervisor and Quality Manager of the Crime Lab (Civilian) of Drug Chemistry and Toxicology, NIBIN, Latent Prints, AFIS. Supervisor Grantham served as Ms. Phillip's intermediate supervisor; she provided oversight, training, and served as a compliance officer with the performance of Ms. Phillips' job duties. As an intermediate supervisor, Supervisor Grantham supervised lower management and Drug Chemists, including promulgation of City policies and procedures.

14.

Ms. Jennifer Rebecca Parker, alias Becky Parker-Hall, a white female, is the Director of the Crime Lab. Ms. Parker served as Ms. Phillips' senior supervisor. As a corporate executive in upper management, Ms. Parker had decision-making managerial authority to direct and control job placement, duties, and policy and procedures for all department employees, including Ms. Phillips.

15.

Leslie Manahan, a white female, is the "Crime Lab" Department Head. As a corporate executive in upper management, Ms. Manahan had decision-making managerial authority to direct and control job placement, duties, and policy and procedures for all department employees, including Ms. Phillips.

16.

Chief Brian Childress, a white male, is the Chief of Police and is part of the executive management team of the Crime Lab.  As a corporate executive in upper management, Mr. Childress had decision-making managerial authority to direct and control job placement, duties and policy and procedures for all city police department employees, including Ms. Phillips.

17.

Mr. Jordan Greene, a white male, is a Criminalist in the Drug Chemistry and Blood Alcohol Toxicology division. Mr. Greene performed the same job duties as Ms. Phillips including drug and alcohol analyses and report writing. Mr. Greene reported to the same chain of command as Ms. Phillips including: Lieutenant Thompson, Supervisor Grantham, Ms. Parker, Ms. Manahan, and Mr. Childress.

18.

Ms. Selena Phinney, a white female, is the Lead Criminalist - Police Officer in the Latent Prints, AFIS & Crime Scene division. Ms. Phinney and Ms. Phillips worked collaboratively in laboratory procedures by analyzing drug and alcohol presence in crime scenes. Ms. Phinney reported to the same chain of command as Ms. Phillips including: Lieutenant Thompson, Supervisor Grantham, Ms. Parker, Ms. Manahan, and Mr. Childress.

19.

Mr. Michael Cartrett, a white male, is a Criminalist and Police officer in the Latent Prints, AFIS & Crime Scene division. Mr. Cartrett and Ms. Phillips worked collaboratively in laboratory procedures by analyzing drug and alcohol presence in crime scenes. Mr. Cartrett reported to the same chain of command as Ms. Phillips including: Lieutenant Thompson, Supervisor Grantham, Ms. Parker, Ms. Manahan, and Mr. Childress.

20.

Ms. Tracy Haddix, a white female, is a Criminalist and Police Officer in the Latent Prints, NIBIN (ballistics) & Crime Scene division. Ms. Haddix and Ms. Phillips worked collaboratively in laboratory procedures by analyzing drug and alcohol presence in crime scenes.   Ms. Haddix reported to the same chain of command as Ms. Phillips including: Lieutenant Thompson, Supervisor Grantham, Ms. Parker, Ms. Manahan, and Mr. Childress.

21.

Ms. Cindy Hasty, a white female, is a civilian evidence custodian.  As an evidence custodian, Ms. Hasty was responsible for complying with chain of evidence protocols and routing evidence to the proper department—Drug Chemistry and Blood Alcohol Toxicology or the Latent Prints department.  Ms. Hasty reported to the same chain of command as Ms. Phillips including: Lieutenant Thompson, Supervisor Grantham, Ms. Parker, Ms. Manahan, and Mr. Childress.

22.

Ms. Catherine Nita-Ammoms, a white female, is the Director of Human Resources.  As the Director of Human Resources, Ms. Nita-Ammoms was the senior management official responsible for hiring, firing, employee management, equal

employment opportunity, employee grievances, and discrimination complaints. Ms. Nita-Ammoms received discrimination-based complaints from Ms. Phillips during her employment with the City.

23.

On or about November 4, 2016, Chief Childress informed Ms. Phillips of an investigation in the Crime Lab related to a purported evidence theft.

24.

Chief Childress told Ms. Phillips that he thought a current employee was responsible for the missing drug evidence.

25.

On June 9, 2017, Ms. Phillips earned her Certification as a Drug Chemist.

26.

On or about January 12, 2017, Ms. Phillips earned her Marijuana Certification.

27.

On or about November 2017, Ms. Phillips received her first annual evaluation at the Crime Lab.

28.

Lieutenant Thompson evaluated her performance, and Ms. Parker-Hall and Chief Childress were reviewing officials of the November 2017 performance review.

29.

Lieutenant Thompson evaluated Ms. Phillips on 14 employee core performance factors.

30.

Lieutenant Thompson scored Ms. Phillips a "3" or "meets expectations" in 13/14 categories.

31.

Lieutenant Thompson scored Ms. Phillips a "4" or "exceeds expectations" for the Job Knowledge category.

32.

Lieutenant Thompson scored Ms. Phillips a "3" for the "Main duties" evaluation section.

33.

Ms. Phillips received an overall rating of "3" for her first annual performance evaluation.

34.

Ms. Phillips was the only African American employee within the Crime Lab.

35.

In summer 2017, in accordance with City policy and practice, Ms. Phillips asked her supervisor, Lieutenant Thompson for a City vehicle to perform her job duties.

36.

Ms. Phillips requested the City vehicle to travel and attend an upcoming hearing that required her sworn testimony.

37.

All Criminalists within the Crime Lab, *except Ms. Phillips*, were assigned company vehicles to perform courtroom duties by virtue of their position.

38.

Lieutenant Thompson prohibited Ms. Phillips from using a City vehicle.

39.

On August 21, 2017, Lieutenant Thompson issued Ms. Phillips a formal counseling letter for failure to follow the chain of command.

40.

On the same date, Ms. Phillips said she did not know the policy and agreed to follow the chain of command thereafter.

41.

In August 2017, Ms. Phillips received a written reprimand from Chief Childress, Ms. Rebecca-Hall, and Lieutenant Thompson for "insubordination".

42.

The July 2017 reprimand alleged that Ms. Phillips was insubordinate for asking for a company vehicle to perform her job duties.

43.

On or about July 13, 2018, Director Parker-Hall notified Ms. Phillips' supervisors that Ms. Phillips will not be solicited to participate in voluntary outside events, though all other non-black employees were allowed to participate.

44.

On or about July 25, 2018, Supervisor Grantham notified Ms. Phillips that she was assigned as the Technical Lead of Blood Alcohol.

45.

In the July 25, 2018 Memorandum, Supervisor Grantham said, "Your assignment as the Technical Lead is indicative of our confidence in your knowledge, skills, and commitment to Valdosta-Lowndes Regional Crime Laboratory."

46.

On or about July 25, 2018, Chief Childress overrode Lieutenant Thompson's authority and assigned Ms. Phillips a company vehicle. Chief Childress also removed Lieutenant Thompson's insubordination reprimand from Ms. Phillips' employment file.

47.

After this incident, Lieutenant Thompson's behavior toward Ms. Phillips became more aggressive and antagonistic.

48.

Lieutenant Thompson sent out an email advising Crime Lab staff that the vehicle assigned to Ms. Phillips was a backup vehicle available for use as needed.

49.

Lieutenant Thompson also complained to Human Resources about the removal of the reprimand, so Human Resources implemented Guardian Tracking for reprimands.

50.

On September 5, 2018, Ms. Phillips was the only Criminalist ordered by Lieutenant Thompson to park her assigned vehicle in the very back of the parking lot while other Criminalists parked anywhere.

51.

Ms. Phillips informed Director Hall of the discriminatory treatment. She responded sarcastically, "walking is good for you, and some people do not have legs".

52.

On September 13, 2018, Ms. Phillips experienced a series of discriminatory events at the Crime Lab.

53.

Ms. Phillips' pending drug analyses were sabotaged when an unknown Crime Lab employee broke toxicology vials—prohibiting her from completing her work.

54.

On or about September 17, 2018, Ms. Phillips discovered that an unidentified employee at the Crime Lab had cut the leather of her left armchair.

55.

Ms. Phillips reported the racially hostile working environment and retaliation to Director Hall.

56.

In response to Ms. Phillips complaints of discrimination, Ms. Phillips' chair arm was taped, but no other remedial steps were taken.

57.

Other non-black Criminalists did not experience work related obstructions or sabotage.

58.

In early October 2018, Director Hall requested that all employees, including Ms. Phillips update her phone and address information.

59.

On the same day, Ms. Phillips provided an updated phone number.

60.

Shortly thereafter, Ms. Phillips provided an updated address.

61.

Despite compliance with the policy, Lieutenant Thompson continuously harassed Ms. Phillips about providing an updated phone number and address for several weeks.

62.

Eventually, Lieutenant Thompson wrote Ms. Phillips a reprimand for incompliance with the address update policy.

63.

On or about mid October 2018, while in the break room, Lieutenant Thompson spewed racial venom at Ms. Phillips, when he said, "what, you don't like the way we treat our blacks, is that the problem"?  Ms. Haddix, Mr. Cartrett and Mr. Greene were also in the breakroom and heard the racially discriminatory comment.

64.

On or about November 14, 2018 Mr. Thompson retaliatory left Ms. Phillips off a work-related email.

65.

Lieutenant Thompson sent the November 14, 2018 email to other non-black Crime Lab employees who had not participated in protected activity.

66.

Ms. Phillips only learned of the email from Ms. Haddix, who forwarded the email to Ms. Phillips.

67.

On or about November 28, 2018, while on company time, Lieutenant Thompson used City technological resources to send a racially derogatory monkey meme to Crime Lab employees.

68.

Immediately, Ms. Phillips expressed her disdain and disapproval for the racially derogatory meme. Yet, Lieutenant Thompson responded apathetically.

Lieutenant Thompson did not apologize.  Lieutenant Thompson showed no outward manifestation of remorse for his discriminatory actions.

69.

Other Criminalists in the Crime Lab expressed indifference to the meme's racial connotation, and its negative, deleterious impacts on Ms. Phillips.

70.

Just three hours after engaging in protected activity, Lieutenant Thompson retaliated against Ms. Phillips by requesting her personal, confidential information in a group toxicology meeting.

71.

On or about November 30, 2018, Lieutenant Thompson gave Ms. Phillips a retaliatory reprimand for not responding to an email from him.  Importantly, Ms. Phillips reported email inbox issues and computer malfunctions to Lieutenant Thompson prior to his reprimand.

72.

Although Ms. Phillips attached screen shots to prove that she had not gotten the email, Lieutenant Thompson said he "did not care" and did not like her attitude.

73.

Ms. Phillips told Lieutenant Thompson she felt his behavior was retaliatory because she had engaged in protected activity when she notified him that his monkey meme was discriminatory.

74.

Ms. Phillips reported Lieutenant Thompson's behavior to human resources, Elaine Plummer and Director Hall.

75.

In response to Ms. Phillips complaints of retaliation, Director Hall told Lieutenant Thompson, "well I am trying to help you keep your job"—showing bias and partiality in the investigation of Ms. Phillips' complaints.

76.

Ms. Phillips requested a meeting with human resources to discuss the retaliatory behavior of Lieutenant Thompson.

77.

On or about November 30, 2018, Ms. Phillips met with Human Resources Director Ms. Nita-Ammoms.

78.

Per Director Ammoms instruction, Ms. Phillips submitted a written complaint detailing acts of discrimination.

79.

In her four-page complaint of discrimination, Ms. Phillips details work sabotage, offensive racial jokes, retaliatory behaviors from Lieutenant Thompson, and feelings of helplessness after repeated complaints without remediation.

80.

Ms. Phillips wrote:

"I do not know what else to do, because I have done what I am supposed to do as an employee, and I am requesting that this behavior towards my person and only my person, be stopped. Sometimes I do not even want to come to work because of the hostile environment, and tactics. I am emotionally and mentally drained, and my family is very concerned for my well-being and protection as well."

81.

Director Ammoms told Ms. Phillips that she would investigate the allegations in her complaint.

82.

The human resources investigation found that other employees under the direction and supervision of Lieutenant Thompson violated the address policy, but Ms. Phillips was the only employee written up.

83.

The City took no disciplinary or remedial actions regarding the substance of Ms. Phillips' discrimination complaints.

84.

On or about November 2018, Ms. Phillips should have received her second annual evaluation at the Crime Lab.  However, Defendant failed to provide a timely annual evaluation of Ms. Phillips performance because of her pending discrimination complaints.  Ms. Phillips finally received her employment evaluation on January 11, 2019, following a mediation with human resources.

85.

Lieutenant Thompson evaluated her performance, and Director Hall was the reviewing official of the November 2018 performance review.

86.

Lieutenant Thompson evaluated Ms. Phillips on 14 employee core performance factors.

87.

Lieutenant Thompson scored Ms. Phillips a "3" or "meets expectations" in 11/14 categories.

88.

Lieutenant Thompson scored Ms. Phillips a "4" or "exceeds expectations" for the Results Orientation, Professional Development, and Professional Appearance categories.

89.

Lieutenant Thompson scored Ms. Phillips a "3" for the 3 of the 5 "Main duties" evaluation sections.

90.

Lieutenant Thompson scored Ms. Phillips a "4" for 2 of the 5 "Main duties" evaluation sections.

91.

Ms. Phillips received an overall rating of "3" for her second annual performance evaluation.

92.

On or around December 17, 2018, Ms. Phillips discovered a small hole in one of three sealed evidentiary plastic bags for an open case.

93.

Ms. Phillips had previously sealed the evidence bag with clear tape and had written her initials and date on the tape, per normal practice.

94.

Ms. Phillips inspected the evidence bag under the camera, confirmed its contents appeared accurate, and then returned the bag to the temporary evidence locker.

95.

The following day, Ms. Phillips reported the tear and suspected discrimination in the plastic bag to Central Receiving.

96.

Ms. Phillips was not at work on the day of the evidence tampering but a "surprise audit" was scheduled which would have made Ms. Phillips appear guilty.

97.

On December 19, 2018, Chief Manahan issued a memorandum summarizing the results from the unannounced inspection of the Crime Lab.  The inspection revealed that "all property and evidence items are being stored in a consistent, secure, and controlled manner" with no evidence of tampering. The memorandum found no evidence of tampering for Ms. Phillips or her associated workstation.

98.

Ms. Phillips reported the suspected tampering incident but was told the camera footage was inconclusive.

99.

Ms. Phillips was the only Chemist at the Crime Lab who experienced evidence tampering.

100.

As a result of Ms. Phillips reporting the incident, she experienced retaliatory treatment from both Lieutenant Thompson and other Criminalists.

101.

Mr. Greene told Ms. Phillips that she should not have said anything and that he did not want to be involved.

102.

Ms. Phillips was no longer invited to lunches with her colleagues, she was left off emails, and was ostracized from employee conversations.

103.

On January 11, 2019, Ms. Phillips participated in mediation with human resources to discuss her racial discrimination and retaliation complaints.

104.

During the January 11, 2019 mediation, instead of investigating the substance of Ms. Phillips' complaints of discrimination, the Defendant, by and through its supervisors and human resources personnel, accused Ms. Phillips of violating standard operating procedure when she reported suspected evidence tampering to human resources.

105.

During the January 11, 2019 mediation, instead of investigating the substance of Ms. Phillips' complaints of discrimination, the Defendant, by and through its supervisors and human resources personnel, issued a retaliatory and discriminatory letter of counseling questioning her integrity and performance, without proof thereof.

106.

Ms. Phillips declined to sign the January 2019 letter of counseling because it had inaccurate statements and she feared that her signature would be interpreted as acknowledgement of deficient performance.

107.

In mid-January 2019, the ANSI National Accreditation Board, American Society of Crime Laboratory Directors (hereinafter "Accreditation Board") visited the Toxicology Lab to complete an inspection and ensure compliance with accreditation standards.

108.

Beginning in November 2018, Ms. Phillips took the initiative to establish the Toxicology Lab, while working with a Retired Consultant from GBI.  Ms. Phillips and Supervisor Grantham were present during the inspection.

109.

During the inspection, the Accreditation Board discovered several broken vials—a violation of accreditation standards.

110.

On January 22, 2019, Ms. Phillips sent a written response to human resources detailing the discriminatory and retaliatory events that occurred on January 11, 2019.

111.

In mid-February 2019, Director Hall told Ms. Phillips that she reviewed the camera footage and that four individuals were viewed on the camera during the period in which the vials may have been broken.

112.

In mid-February 2019, Director Hall told Ms. Phillips that because of the camera footage angles, she was not able to identify the individuals who had broken the vials.  However, the camera footage conclusively excluded Ms. Phillips as the responsible party because she was not one of the four individuals identified on-camera.

113.

On or about April 2, 2019, Ms. Phillips was visited by FBI Special Agent Thomas Clark who informed her that an anonymous report was made by an individual with information about being the victim of illegal phone taps and threats

made regarding her safety.  Pursuant to the advice of the FBI Agent, Ms. Phillips

filed a EEOC Charge.

114.

On or about April 2019, Lieutenant Thompson invited parents and their

children for a tour to the Crime Lab to orchestrate a baseless allegation of criminal

activity against Ms. Phillips.

115.

Director Hall and Supervisor Grantham required Ms. Phillips to attend an

employment interrogation; in this meeting, Ms. Phillips' supervisors accused her of

committing crimes against minors.

116.

According to Director Hall, the parents invited by Lieutenant Thompson had

complained that Ms. Phillips encouraged and condoned the illicit and illegal use of

drugs and alcohol among children.

117.

Immediately, Ms. Phillips denied the veracity of the illegal and unethical

behavior.  Ms. Phillips told Director Hall and Supervisor Grantham that the

allegations were unfounded, retaliatory, and discriminatory.

118.

Ms. Phillips requested a copy of the so-called complaint, but Lieutenant Thompson refused to produce the contact information of the complainants.

119.

Because of Lieutenant Thompson's fraudulent and discriminatory actions, Ms. Phillips reputation was marred in the workplace.

120.

Because of Lieutenant Thompson's fraudulent and discriminatory actions, Ms. Phillips was denied employment opportunities previously afforded to her—she was no longer allowed to complete tours without supervision.

121.

On or about May 16, 2019, Ms. Philips was involved in an automobile accident.

122.

In the automobile accident, Ms. Phillips sought out immediate medical treatment at South Georgia Medical Center for fluid in her lungs, severe muscle spasms, cervical strain, spine inflammation, and shoulder strain and pain.

123.

On the same date of the accident, while at the South Georgia Medical Center, Ms. Phillips notified her supervisor of the accident and requested three days off pursuant to doctor's orders.

124.

Dr. Plaxco created a treatment plan for Ms. Phillips which included physical therapy, additional CT/MRI testing, and various medications to manage pain and nausea.

On May 20, 2019, Ms. Phillips requested the Family Medical Leave Act (FMLA) and the paperwork was sent to her via email.

125.

On or about May 21, 2019, Ms. Phillips received an approval for a leave of absence from May 16, 2019-June 17, 2019 under FMLA.

126.

On May 29, 2019, Supervisor Grantham contacted Ms. Phillips to ask her to perform work duties—informing the courts of her absence during Ms. Phillips' approved leave period.

127.

On May 29, 2019, Supervisor Grantham inquired about Ms. Phillips' medical conditions which necessitated her FMLA application.

128.

On May 31, 2019, Ms. Phillips' doctor faxed her medical certification to the City of Valdosta; the form was faxed again on June 3, 2019.

129.

On June 4, 2019, Ms. Berna Hepburn from human resources, confirmed receipt of the medical certification form.

130.

On June 4, 2019, Ms. Berna Hepburn from human resources, told Ms. Phillips that the restrictions would not impede performance of her job duties at the Crime Lab and asked her, "would you be willing to come back to work and do light duty?"

131.

Ms. Phillips declined the offer and explained her ongoing medical ailments including walking limitations, driving restrictions, medical appointment schedule, and inability to stand erect.

132.

Defendant told Ms. Phillips repeatedly that her condition was not serious, that her condition was not severe, and that it was "just whiplash."

133.

On or about June 17, 2019, Ms. Phillips submitted a third medical certification to Defendant.

134.

The June 17, 2019 medical certification noted that Ms. Phillips had "neck spasms, acute back injury, spinal decompression therapy, ultrasonic massage, and adjustment therapy."

135.

The June 17, 2019 medical certification noted that Ms. Phillips' period of incapacity would extend through July 15, 2019.

136.

The June 17, 2019 medical certification noted that Ms. Phillips was being "treated with muscle relaxers and therapy to aid in full mobility. Cervical x-ray noted degenerative changes and muscle spasm thoracic x-ray noted degenerative changes."

137.

On or about June 24, 2019 Defendants requested that Ms. Phillips complete a second medical evaluation.

138.

Defendant allowed Ms. Phillips' health benefits she was entitled to receive under FMLA to lapse.

139.

On July 9, 2019, Ms. Phillips completed the second medical evaluation with Dr. Thompson, Defendant's selected medical provider.  During the medical

evaluation, Dr. Thompson told Ms. Phillips that the recommended treatment plan and recovery for her injuries was six months.

140.

The City consistently told Ms. Phillips she was not eligible for FMLA and had insufficient paperwork.  Ms. Phillips then contacted the U.S. Department of Labor Wage and Hour Division to investigate the matter.

141.

The Department of Labor Wage and Hour Division concluded their findings and Ms. Phillips was awarded her FMLA benefits.

142.

On July 11, 2019, Director Ammons sent Ms. Phillips an email asking when she was returning to work.

143.

On July 15, 2019, the City purposefully excluded Ms. Phillips from a newspaper article showcasing the new Toxicology department that she founded.

144.

On or about July 16, 2019, Ms. Phillips returned and was forced to work in a new location, the Valdosta Police Department.

145.

Ms. Phillips was the only Criminalist who returned from FMLA and was not placed in her original position.

146.

Ms. Phillips was forced to do physical activities which conflicted with her medical certification limitations including bending down repeatedly, standing for prolonged periods of time to file and retrieve paperwork, twisting at the waist, and walking long distances.

147.

On July 18, 2019, after returning to work, Defendant finally approved Ms. Phillips' FMLA leave.

148.

From May 16, 2019-July 16, 2019, Defendant, by and through its supervisors and human resources department, continuously contacted Ms. Phillips on a weekly basis to discourage her from using FMLA, suggested her medical conditions were not serious enough to qualify for FMLA, and requested that she return to work despite doctor's orders explaining her incapacitation.

149.

Because of Defendant's actions occurring during and after FMLA, Ms. Phillips was fearful from using additional FMLA for doctor's appointments related to her medical care.

150.

Because of Defendant's actions occurring during and after FMLA, Ms.

Phillips declined to continue necessary medical treatments for fear of losing her

job.

151.

In September 2019, Ms. Phillips filed a supplemental complaint with the

Department of Labor related to retaliation and inference of her FMLA rights.

152.

On or about August 16, 2019, Ms. Phillips was asked to be an expert witness

in the case involving Moody Air Force Base.

153.

Pursuant to the City of Valdosta Personnel Policies & Procedures, Section

21- Use of City Vehicles, Criminalists are allowed to use a city vehicle to perform

employment-related travel, including transportation to and from a court

proceeding.

154.

Although Ms. Phillips needed a company vehicle to testify in the upcoming

hearing at Moody Air Force Base, she was prohibited from using a city vehicle.

155.

Chief Manahan told Ms. Phillips to "take a taxi or an uber." The taxi or uber option suggested by Chief Manahan would have required Ms. Phillips to pay upfront for the costs of roundtrip travel of 50 miles.

156.

Chief Manahan also told Ms. Phillips to have the Moody Air Force Base transport her to and from the proceedings.  Ms. Phillips asked Moody Air Force Base, and they declined to provide transportation for her.

157.

Chief Manahan eliminated Ms. Phillips' access to a city vehicle because of purported safety concerns.  However, the advanced rationale of 'safety' was pretextual because Ms. Phillips was permitted to drive without restriction pursuant to physician approval.  Chief Manahan had knowledge of Ms. Phillips' doctor's note, but declined to provide her with a vehicle, nonetheless.

158.

Other similarly situated non-black Criminalists who returned to work following approved FMLA, were not denied access to company vehicles.

159.

After a month of working under less favorable employment terms, on or about August 22, 2019, Ms. Phillips was restored to her original position as Criminalist.

160.

On or about August 23, 2019, and despite the instruction of human

resources, Lieutenant Thompson asked Ms. Phillips confidential information

regarding her FMLA.

161.

On or about August 29, 2019, Ms. Phillips interviewed with the EEOC and a

charge was filed and served on the Defendant.

162.

One week filing the charge of discrimination, the City retaliated against Ms.

Phillips with discriminatory application of policy and discriminatory reprimands.

163.

On September 6, 2019, Supervisor Grantham singled out Ms. Phillips to

correct the spacing on a case report.

164.

On September 6, 2019, Ms. Phillips engaged in protected activity when she

asked Supervisor Grantham to explain the retaliatory, unequal application of the

'spacing policy' via email.

165.

Later that day, on September 6, 2019, Supervisor Grantham issued Ms.

Phillips a written reprimand for "offensive language and insubordination."

166.

On the same date, Ms. Phillips sent an email to Director Hall, Supervisor Grantham, Chief Manahan, and Director Ammons requesting a meeting for retaliatory, discriminatory write-ups following submission of her EEOC charge.  In her email, Ms. Phillips writes, "I am forwarding the emails, to prove my point, of harassing, and discriminatory in nature conduct by the Drug Chemistry section administration."

167.

Then, Director Hall and Supervisor Grantham retaliatory accused Ms. Phillips of being insubordinate and demeaning in her email correspondence with Lieutenant Thompson.

168.

Between September 26, 2019 and October 1, 2019, Lieutenant Thompson, again, intentionally left Ms. Phillips off work email correspondence regarding tours and other updates pertaining to the Crime Lab.

169.

In response to her protected activity, Defendant began assigning an influx of discipline cases to Ms. Phillips to increase her workload exponentially; Ms. Phillips was the only chemist being assigned cases for discipline.

170.

Ms. Phillips reported the discriminatory and retaliatory increase in her caseload to human resources.

171.

Ms. Phillips was informed by human resources that Lieutenant Thompson had instructed her colleagues to keep records of all their interactions with Ms. Phillips.

172.

On or about October 3, 2019, the Department of Labor Wage and Hour Division issued their decision and found the City in violation of FMLA Rights and Policy.

173.

On November 29, 2019, Ms. Phillips engaged in protected activity when she amended her EEOC Charge to reflect the updates of the Department of Labor Wage and Hour Division.

174.

Following several complaints of discrimination, hostile work environment, FMLA violations, and an updated EEOC charge, Defendant retaliated against Ms. Phillips with a lower employment evaluation.

175.

On or about November 11, 2019, Ms. Phillips received her third annual evaluation at the Crime Lab.

176.

Supervisor Grantham evaluated her performance, and Ms. Parker-Hall was the reviewing official of the November 2019 performance review.

177.

Supervisor Grantham evaluated Ms. Phillips on 14 employee core performance factors.

178.

Supervisor Grantham scored Ms. Phillips a "3" or "meets expectations" in 11/14 categories.

179.

Supervisor Grantham scored Ms. Phillips a "2" or "below expectations" for the Team and Cooperation, Communication, and Accountability categories.

180.

The November 2019 annual performance evaluation was the first time Ms. Phillips received an unsatisfactory rating.

181.

Supervisor Grantham scored Ms. Phillips a "3" for all 5 "Main duties" evaluation sections.

182.

Ms. Phillips received an overall rating of "3" for her third annual performance evaluation.

183.

Because of the discriminatory evaluation, Ms. Phillips was excluded from the opportunity to receive a merit raise—an employment benefit she would have been entitled to as a city employee.

184.

In the November 2019 evaluation, Supervisor Grantham did not give Ms. Phillips credit for starting the Toxicology Lab.

185.

In December 2019, Lieutenant Thompson gave Christmas gifts to all of his employees in the Crime Lab except Ms. Phillips.

186.

Criminalists are required to complete and submit annual goals and training for continuing education.  To acquire approval, city employees complete a travel request form and submit it to their immediate supervisor.

187.

On or around December 11, 2019, Ms. Phillips submitted a travel request to Director Hall and Chief Manahan to attend an Advanced Clandestine Lab course in California from April 26-May 1, 2020.

188.

Director Hall and Chief Manahan had pre-approved the training for Ms. Phillips.

189.

On or about February 20, 2020, Director Hall retaliatory rescinded training opportunity for Ms. Phillips because 'she [Ms. Phillips] was being cut from the budget.'

190.

On or about February 21, 2020, Lieutenant Thompson began stalking Ms. Phillips by following her to the restroom and sifting through her shredded trash.

191.

Ms. Phillips engaged in protected activity when she reported the racially hostile working environment to Director Hall.

192.

Director Hall did nothing to stop or prevent the discriminatory behavior or hold Lieutenant Thompson accountable for his actions.

193.

After receiving notice of Ms. Phillips' discrimination complaints, Director Hall failed to follow City Equal Employment Opportunity procedures in sections 11 and 12, which require an immediate investigation into allegations of racial harassment.

194.

On or about March 3, 2020, Ms. Phillips was given a retaliatory written reprimand for following up on her racial discrimination complaints against Lieutenant Thompson.

195.

Ms. Phillips was similarly reprimanded for asking why she was the only person that was 'cut from the budget.'

196.

Chief Manahan denied Ms. Phillips pre-approved travel requests and educational training.

197.

Ms. Phillips was then threatened and told a countersuit for harassment would follow if she chose to file an employment discrimination lawsuit.

198.

On or around May 14, 2020, Ms. Phillip's chemistry testing revealed the presence of a Flubromazolam - Schedule IV derivative.  Despite a positive test result, Ms. Phillips was required by Supervisor Grantham and Director Hall to change the report results to negative.

199.

The mandate by City executives to falsify test results made Ms. Phillips concerned for her professional reputation, credentials, ethical obligations, and employment mandates.  The reports generated by Ms. Phillips are used as dispositive evidence for prosecuting agencies to charge defendants with appropriate crime classifications.

200.

Criminalist Greene, a white male who had not engaged in protected activity, found the same drug, Flubromazolam, and was told to report it as a positive result.

201.

Criminalist Greene informed Ms. Phillips of the arbitrary difference in reporting required by Defendant.

202.

Concerned about potential legal and employment repercussions, Ms. Phillips immediately requested an amendment of her report without resolve.

203.

In or around late May 2020, Ms. Phillips called 911 because an unknown City employee had tampered with her pizza lunch by chewing portions of her pizza then spitting it back out on top of her pizza.

204.

On or about June 11, 2020, Ms. Phillips discovered that Lieutenant Thompson was investigating her completed case files to create a paper trail of incompetence.

205.

On or about June 11, 2020 Ms. Phillips came back from lunch to find an old report from February 14, 2020 sitting on her printer, open-faced.

206.

Lieutenant Thompson, the only supervisor with access to completed reports, had sent the February 2020 report to Ms. Phinney for printing—a violation of company policy.

207.

Although the evidence was clear who printed the document, when asked, Ms. Phinney lied.

208.

To protect her employment security, Ms. Phillips sought out Supervisor Grantham immediately to report the violation, but Supervisor Grantham was unavailable.

209.

Supervisor Grantham would not listen to Ms. Phillip's workplace harassment complaints; instead, Supervisor Grantham chose to issue Ms. Phillips another retaliatory reprimand.

210.

After reporting the incident to Chief Manahan, Supervisor Grantham returned to the Crime Lab to issue a formal disciplinary reprimand.

211.

Ms. Phillips objected to the reprimand; she told Supervisor Grantham that she was being falsely accused, that the racially hostile working environment was unbearable, and that she could not take it any longer.  Ms. Phillips said, "I quit."

212.

Supervisor Grantham pushed the written reprimand in front of Ms. Phillips, beckoning her to take it. Ms. Phillips ripped up the reprimand.

213.

Ms. Phillips left the Crime Lab to retrieve her personal items from her office.  Supervisor Grantham followed Ms. Phillips, screaming at her.

214.

As Ms. Phillips ascends the stairs, Supervisor Grantham follows her and tells Lieutenant Thompson and others that Ms. Phillips has just quit.

215.

Lieutenant Thompson, Supervisor Grantham, and others begin to crowd toward Ms. Phillips' office.  In fear for her safety and professional reputation, Ms. Phillips shuts the door and calls the police for an escort.

216.

Chief Manahan, Officer Smith, and Officer Vega confront Ms. Phillips about quitting her position.  Ms. Phillips confirms that she quit.  Chief Manahan announces in the hallway, your resignation is effective immediately.

217.

Amidst the verbal warning from Supervisor Grantham alleging that Ms. Phillips was the aggressor toward her peers, allegations of insubordination, and yet another written reprimand for engaging in protected activity, Ms. Phillips was constructively terminated from her position at the City of Valdosta.

218.

Ms. Phillips wrote, "As of Friday, June 12, 2020, I have officially resigned from my duties as a Criminalist, at the Valdosta-Lowndes Regional Crime Laboratory and the Valdosta Police Department. The primary reason is due to an unsafe work environment that interfered with my job duties/work, by past Supervisor and colleagues; constant harassment, retaliation, and being made by management to report out a false negative result; sabotaging my work."

219.

Ms. Phillips completed her exit interview with human resources and described her racially hostile working environment.

220.

Ms. Phillips noted to human resources that she had been harassed by supervisors for over 2 years, had made repeated complaints of discrimination, had endured multiple instances of retaliation, and could not take the abuse any longer.

221.

Ms. Phillips was awarded unemployment, due to the racially toxic work environment.

222.

Since resigning from the City of Valdosta, Ms. Phillips has been unable to find stable employment.

223.

The City of Valdosta has continuously retaliated against Ms. Phillips by providing unfavorable references to prospective employers.

## COUNT I: EMPLOYMENT DISCRIMINATION IN CONTRAVENTION OF TITLE VII

224.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

225.

The City of Valdosta intentionally created and acquiesced in the racially discriminatory behavior of its supervisors Thompson, Grantham, and Manahan when it failed to take any remedial action after receiving notice thereof. Lieutenant Thompson intentionally created a racially hostile working environment with the repeated and pervasive use of racial stereotypes, racially offensive comments, and use of his supervisory role to create racial hierarchies among the staff.

226.

Supervisor Grantham and Chief Manahan intentionally created and acquiesced in the racially hostile working environment by refusing to intervene on behalf of Ms. Phillips after receiving notice of discriminatory complaints.

Supervisor Grantham and Chief Manahan allowed the discriminatory behavior to continue by silencing Ms. Phillips and constructively terminating her, among other actions.

227.

All a result of the unlawful actions of the Defendant, Ms. Phillips has suffered loss of income, emotional pain, suffering, mental anguish, and other non-pecuniary losses.

228.

Based on all the facts incorporated to support this Count, Plaintiff has demonstrated that Defendant violated Ms. Phillips' Title VII rights by subjecting her to a racially hostile working environment.

229.

Based on all the facts incorporated to support this Count, Plaintiff has presented a convincing mosaic of evidence from which a jury could infer discriminatory intent.

**COUNT II:**
**RETALITORY EMPLOYMENT DISCRIMINATION IN**
**CONTRAVENTION OF TITLE VII**
*(Against all Defendants in their individual and official capacities.)*

230.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

231.

The City, by and through the actions of its supervisors, executive staff, and human resources division, retaliated against Ms. Phillips after she engaged in protected oppositional activity by altering the terms and conditions of her employment—eliminating access to employment benefits vis a vis a city vehicle and tour participation, creating a hostile work environment, reassigning her to work in another location, increasing her workload, and others.

232.

Lieutenant Thompson's retaliatory conduct, following notice of Ms. Phillips' complaints of a racially hostile working environment and EEOC charges constitutes unlawful retaliation in violation of Title VII.

233.

After receiving notice of Ms. Phillip's protected oppositional activity, the City acted with intentionality, malice, and reckless indifference to Ms. Phillip's federally protected rights.

234.

Based on all the facts incorporated to support this Count, Plaintiff has demonstrated that Defendants violated Ms. Phillips' Title VII rights by subjecting her to retaliatory conduct that has a range of closely proximate protected activities ranging from days to weeks.

## COUNT III:
## RACIAL DISCRIMINATION IN CONTRAVENTION OF SECTION 1981
*(Against all Defendants in their individual and official capacities.)*

235.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

236.

Lieutenant Thompson intentionally created a racially hostile working environment with the repeated and pervasive use of racial stereotypes, racially offensive comments, and use of her supervisory role to create racial hierarchies among the staff.

237.

Director Hall, Supervisor Grantham, and Chief Manahan intentionally created and acquiesced in the racially hostile working environment by refusing to intervene on behalf of Ms. Thompson after receiving notice of discriminatory

complaints. The City allowed the discriminatory behavior to continue by silencing Ms. Phillips and constructively terminating her, among other actions.

238.

The City of Valdosta, by and through its supervisors, executive management, and human resources division, intentionally created and acquiesced in the racially discriminatory behavior of its supervisors Thompson, Hall, Grantham, and Manahan when it failed to take any remedial action after receiving notice thereof.

239.

The City of Valdosta denied Ms. Phillips the same right to make and enforce employment contracts, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, as described above and to be further proved at trial, because of her race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

240.

As a result of the unlawful actions of Defendant, Ms. Phillips has suffered loss of income, emotional pain, suffering, mental anguish, and other non-pecuniary losses.

241.

Based on all the facts incorporated to support this Count, Plaintiff has

demonstrated that Defendants violated Ms. Phillips' Section 1981 rights by

subjecting her to a racially hostile working environment.

## COUNT IV:
## RETALITORY RACIAL DISCRIMINATION IN CONTRAVENTION OF SECTION 1981

242.

All of the foregoing allegations are repeated and realleged as though fully

set forth herein.

243.

The City of Valdosta's retaliatory conduct, following Ms. Phillip's

complaints of a racially hostile working environment and EEOC charges constitute

unlawful retaliation in violation of Section 1981.

244.

The City of Valdosta acted with intentionality, malice, and reckless

indifference to Ms. Phillip's federally protected rights.  Defendants, acting under

color of statute, ordinance, regulation, and with a policy, custom, or usage of

allowing, abetting, and perpetrating racial discrimination, subjected Ms. Phillips,

or caused her to be subjected, to the deprivation of rights, privileges, or immunities

secured by the Civil Rights Act of 1866, 42 U.S.C. § 1981, by and through 42 U.S.C. § 1983.

245.

Defendants racially discriminatory employment practices were a significant and determining factor in the decision of Defendant to subject Ms. Phillips to the described abusive retaliatory treatment.

246.

The reasons given for denial of Ms. Phillips' rights to make and enforce contracts, as described herein, including the reasons given for the abusive retaliatory treatment including policy enforcement and employment performance issues are pretextual for Defendant's discriminatory animus.

247.

Based on all the facts incorporated to support this Count, Plaintiff has demonstrated that Defendants violated Ms. Phillips' Section 1981 rights by subjecting her to retaliatory conduct that has a range of closely proximate protected activities ranging from days to weeks.

**COUNT V:**

**VIOLATION OF THE FAMILY LEAVE AND MEDICAL ACT PURSUANT TO 29 U.S.C. § 2612**

248.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

249.

Defendants interfered with Ms. Phillips' FMLA rights when they: discouraged her from taking leave, told her that her serious medical condition would not qualify for protections under FMLA, unnecessarily delayed the processing of her FMLA application despite timely submission of medical documentation, required Ms. Phillips to physically report to work despite timely submission of medical documentation, requested a second medical opinion without "reason to doubt the validity of the certification provided," requested confidential medical information outside of the FMLA application approval process, questioned the validity of her FMLA time records without justification, allowed her medical benefits to lapse, and repeatedly pressured her to return to work prior to the expiration of her 12 weeks of leave provided under FMLA.

250.

Defendants intentionally discriminated and retaliated against Ms. Phillips when it placed her in an alternative job placement which exacerbated her injuries when she returned to work for having exercised an FMLA right.

251.

Defendants placed Ms. Phillips at the police department because she exercised an FMLA right.

252.

Supervisors Grantham and Thompson were awarded FMLA, and both were prescribed medications following their return to the workplace.  However, unlike Ms. Phillips, Supervisor Grantham and Lieutenant Thompson were not retaliated against with alternative job placements and lack of access to employment privileges.

253.

Also, Defendants did not treat her peer, Mr. Cartrett, who was a non-black employee and similarly situated to Ms. Phillips in the same discriminatory manner when he was awarded FMLA.  Namely, Defendants did not place Mr. Cartrett in an alternative job location following the exercise of Mr. Cartrett's FMLA rights. Ms. Selena Phinney also took FMLA during the period of Ms. Phillips employment with the City, without retaliatory placement thereafter.

254.

Defendants retaliatory conduct occurred days to weeks following Ms. Phillips' exercise of FMLA rights, including submission of her application, submission of her medial certification forms, and absence from the Crime Lab.

## COUNT VI:

## ATTORNEY'S FEES

255.

Based on the facts alleged in this Complaint, Plaintiff is entitled to attorney's fees against Defendant under 42 U.S.C. § 1988(b), 42 U.S.C. § 2000e-5(k), 29 U.S. Code § 2617, and all applicable laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a) That process issue and service be had on each Defendant;

b) That a jury trial be had on all issues so triable;

c) That Plaintiff be awarded all costs and other expenses in an amount to be determined at trial, including attorney's fees;

d) That Plaintiff have judgment against Defendants for punitive damages;

e) That this Court grant compensatory and equitable relief to Plaintiff; and

f) That Plaintiff receives such other and further relief as this Court deems just and proper.

DATE: May 22, 2021

Respectfully submitted,



_____

Angelik Edmonds
Attorney for Ms. LaFaith Phillips
GA Bar: 650757
Edmonds Law Office of Civil Rights LLC
691 John Wesley Dobbs Avenue NE
Suite V-17 Atlanta, Georgia 30312
O: 678-404-1239
F: +1 678-623-9090
E: angie@aedmondslaw.com